# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| **TULSTAR PRODUCTS, INC., Individually and on Behalf of all Others Similarly Situated,**<br><br>**Plaintiff,**<br><br>v.<br><br>**STOLT-NIELSEN SA; STOLT-NIELSEN TRANSPORTATION GROUP, LTD; ODFJELL ASA; ODFJELL USA, INC; JO TANKERS BV; JO TANKERS USA, INC.; and TOKYO MARINE CO., LTD.,**<br><br>**Defendants.** | Civil Action No. _____<br><br>**CLASS ACTION**<br><br>**COMPLAINT FOR VIOLATION OF FEDERAL ANTITRUST LAWS**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff, individually and on behalf of all those similarly situated, brings this action for damages and injunctive relief under the antitrust laws of the United States against defendants, demanding a trial by jury, and complaining and alleging as follows:

## NATURE OF THE CASE

1.      This lawsuit is brought as a class action on behalf of all individuals and entities who paid freight to defendants, their predecessors or their controlled subsidiaries to transport liquid chemicals in parcel tankers from at least as early as June 1, 1998 to February 20, 2003 (the "Class").  Plaintiff alleges that, during the relevant period, the defendants conspired to fix, raise, maintain or stabilize freight for shipping liquid chemicals in parcel tankers traveling to and from ports in the United States and elsewhere.  Defendants discussed which shipping business each would bid for, route by route, even exchanging information on bid prices.  Because of defendants' unlawful conduct, plaintiff and other members of the Class paid parcel tanker freight

rates which were maintained at artificially high and non-competitive levels and, as a result, have suffered antitrust injury to their business or property.

## JURISDICTION AND VENUE

2.      This action is instituted under Sections 4 and 16 of the Clayton Act,15 U.S.C. §§ 15 and 26, to recover treble damages and costs of suit, including reasonable attorneys' fees, against defendants for the injuries sustained by plaintiff and the members of the Class by reason of the violations, as hereinafter alleged, of Section 1 of the Sherman Act, 15 U.S.C. §1.

3.      This action is also instituted to secure injunctive relief against defendants to prevent them from further violations of Section 1 of the Sherman Act, as hereinafter alleged.

4.      Jurisdiction is conferred upon this Court by 28 U.S. C. §§1331, 1337 and by Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§15(a) and 26.

5.      Venue is laid in this district pursuant to Sections 4, 12 and 16 of the Clayton Act, 15 U.S.C. §§15, 22 and 26 and 28 U.S.C. §1391(b), (c) and (d).  Venue is proper in this judicial district because during the relevant period one or more of the defendants resided, transacted business, was found, or had agents in this district, and because a substantial part of the events giving rise to plaintiff's claims occurred, and a substantial portion of the affected interstate trade and commerce described below, has been carried out in this district.

6.      The defendants, on information and belief, maintain offices, have agents, transact business, or are found within this judicial district.

7.      An on-going criminal investigation in connection with the events giving rise to plaintiff's claims is being conducted in the Eastern District of Pennsylvania by the U.S. Department of Justice ("DOJ") and the Federal Bureau of Investigation ("FBI").  A grand jury

has been convened in that judicial district to gather evidence and hear testimony in connection with this criminal antitrust investigation. On or about June 24, 2003, in connection with the criminal antitrust investigation by the DOJ and FBI, Richard B. Wingfield, the former Managing Director of the Tanker Trading Division of defendant Stolt-Nielsen Transportation Group, Ltd. was arrested and charged with violating Section 1 of the Sherman Act (15 U.S.C. §1) in that judicial district, *USA v. Wingfield*, Criminal Case No. 2:03-mj-576-UJ-ALL.

8.       This Court has *in personam* jurisdiction over each of the defendants because each was engaged in an illegal scheme and price-fixing conspiracy that was directed at and had the intended effect of causing injury to persons and entities residing in, located in, or doing business throughout the United States. Defendant Stolt-Nielsen SA does business in the United States directly and through its wholly-owned subsidiary Stolt-Nielsen Transportation Group Ltd. Defendant Odfjell ASA does business in the United States directly and through its wholly-owned subsidiary Odfjell USA Inc. Defendant Jo Tankers B.V. does business in the United States directly and through its wholly-owned subsidiary Jo Tankers USA, Inc. Defendants Odfjell ASA, Stolt Nielsen SA, and Jo Tankers B.V. exercised dominion and control over their respective wholly-owned subsidiaries while these companies were conducting business in the United States. Tokyo Marine does business directly in the United States.

9.       To the extent that plaintiff entered into a contract with a defendant or a subsidiary or affiliate thereof, for the provision of parcel tanker service that contained a choice of law, choice of forum or arbitration provision, such terms were terms of adhesion that were neither freely negotiated nor negotiable. Moreover, the arbitration clauses to the extent they exist, were never intended to cover antitrust maters, as they were designed to be heard by arbitrators who are

3

"commercial men" involved in shipping and who for the most part, have no legal training and certainly no antitrust experience. The arbitrations usually involve disputes that relate to a particular voyage, such as demurrage or laytime calculations, or problems that occur at loading or unloading. The arbitration clauses were never intended to relate to antitrust claims that involve the conspiratorial actions of the subsidiaries or affiliates' parent entities and managers, who do not have arbitration agreements with plaintiff and class members. Plaintiff and the class members cannot effectively vindicate their statutory antitrust cause of action in litigation or arbitration outside of the United States.

10.     To the extent that plaintiff entered into a contract with a defendant or its subsidiary or affiliate that contained a term of adhesion involving the choice of law, choice of forum or arbitration for a particular transaction, the other co-conspirators were not parties to such agreement and, therefore, plaintiff is entitled to pursue this action against such defendant co- conspirators.

## **DEFINITIONS**

11.     As used herein, the term:

    a.     "Parcel tankers" means the large, ocean-going ships which are fitted with separate tanks used to hold liquid chemicals, oils, fats and/or other products;

    b.     "Liquid chemicals" means any bulk liquid chemicals, edible oils and fats, acids, and other specialty liquids;

    c.     "Freight" means the price for carriage of goods by sea;

d.      "Person" means any individual, partnership, corporation, association or

other business or legal entity; and

e.      "Class period" or "relevant period" means the period from June 1, 1998 to

February 20, 2003.

## PLAINTIFF

12.      Plaintiff Tulstar Products, Inc. ("Tulstar" or "plaintiff") is a corporation with its

principal place of business in Tulsa, Oklahoma.  During the relevant period, Tulstar paid freight

to one or more of the defendants or their co-conspirators to ship liquid chemicals on parcel

tankers.  The prices paid by plaintiff to defendants or their co-conspirators for parcel tanker

freight was artificially high as a result of the conspiracy herein alleged.  As a result of the alleged

conspiracy, plaintiff was injured in its business and property by reason of the antitrust violations

alleged herein.

## DEFENDANTS

13.      Defendant Stolt-Nielsen SA ("Stolt-Nielsen") is a Luxembourg entity with its

principal place of business at 8 Sound Shore Drive, Greenwich, Connecticut 06830.  Stolt-

Nielsen has a headquarters in London, but its senior shipping managers operate in Greenwich,

Connecticut.  Stolt-Nielsen is a public entity, the stock for which is listed in Oslo and on the

Nasdaq Stock Market.  Stolt-Nielsen is 49%-owned by the family of its founder, Jacob Stolt-

Nielsen. During the relevant period, Stolt-Nielsen owned and/or operated parcel tankers which

shipped liquid chemicals to and from ports in the United States and elsewhere, the freight for

which was maintained at artificially high and non-competitive levels.

14.     Defendant Stolt-Nielsen Transportation Group Ltd. ("Stolt-Nielsen Group") is a Delaware corporation with its principal place of business at 8 Sound Shore Drive, Greenwich, Connecticut 06830.  During the relevant period, Stolt-Nielsen Group owned and/or operated parcel tankers which shipped liquid chemicals to and from ports in the United States and elsewhere, the freight for which was maintained at artificially high and non-competitive levels.

15.     Defendants Stolt-Nielsen and Stolt-Nielsen Group are collectively referred to herein as "Stolt".

16.     Defendant Odfjell ASA ("Odfjell ASA") is a Norwegian corporation with its principal place of business in Bergen, Norway.  During the relevant period, Odfjell ASA owned and/or operated parcel tankers which shipped liquid chemicals to and from ports in the United States and elsewhere, the freight for which was maintained at artificially high and non-competitive levels.

17.     Defendant Odfjell USA, Inc. ("Odfjell USA") is a Delaware corporation with its principal place of business in Seabrook, Texas.  During the relevant period, Odfjell USA  owned and/or operated parcel tankers which shipped liquid chemicals to and from ports in the United States and elsewhere, the freight for which was maintained at artificially high and non-competitive levels.

18.     Defendants Odfjell ASA and Odfjell USA are collectively referred to herein as "Odfjell."

19.     Defendant Jo Tankers BV is a Dutch corporation with its principal place of business in Boyleweg 6, 3208 KA Spijkenisse, Netherlands.   During the relevant period, Jo Tankers owned and/or operated parcel tankers which shipped liquid chemicals to and from ports

in the United States and elsewhere, the freight for which was maintained at artificially high and non-competitive levels.

20.     Defendant Jo Tankers USA Inc. ("Jo Tankers") is a Texas corporation with its principal place of business in Houston, Texas.  During the relevant period, Jo Tankers owned and/or operated parcel tankers which shipped liquid chemicals to and from ports in the United States and elsewhere, the freight for which was maintained at artificially high and non-competitive levels.

21.     Defendants Jo Tankers BV and Jo Tankers are collectively referred to herein as "Jo Tankers."

22.     Defendant Tokyo Marine Co. Ltd. ("Tokyo Marine") is a Japanese corporation with its principal place of business at 4-4 Nihonbashi-Muromachi, 3-chome, Chuo-ku, Tokyo 103-0022, Japan.   Tokyo Marine offices are also located in The Netherlands.  During the relevant period, Tokyo Marine owned and/or operated parcel tankers which shipped liquid chemicals to and from ports in the United States and elsewhere, the freight for which was maintained at artificially high and non-competitive levels.

23.     Whenever in this Complaint reference is made to any act, deed or transaction of any corporation, the allegation means that the corporation engaged in the act, deed or transaction by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the corporation's business or affairs.

## CO-CONSPIRATORS

24.     Various other persons, firms and corporations, not named as defendants in this

Complaint, have participated as co-conspirators with defendants in the violations alleged herein,

and aided, abetted and performed acts and made statements in furtherance of the conspiracy.

## TRADE AND COMMERCE

25.     The activities of defendants and their co-conspirators, as described in this

Complaint, were within the flow of, and substantially affected, interstate commerce.

26.     During the time period covered by this Complaint, defendants and their co-

conspirators agreed on freight rates for parcel tankers traveling to and from the United States and

elsewhere.

27.     Defendants and their co-conspirators, and each of them, have used

instrumentalities of interstate commerce to set freight rates for parcel tankers traveling to and

from the United States and elsewhere.

28.     Defendants and their co-conspirators have charged freight for parcel tankers

traveling to and from the United States and elsewhere, resulting in a continuous and

uninterrupted flow of interstate commerce to customers located throughout the United States.

## CLASS ACTION ALLEGATIONS

29.     Plaintiff brings this action on behalf of itself and as a class action under the

provisions of Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all

members of the following class:

> All persons (excluding governmental entities, defendants, co-
> conspirators, and the present and former parents, predecessors,
> subsidiaries and affiliates of the foregoing) who paid freight to

8

defendants (or their co-conspirators, or any present or former
parent, subsidiary or affiliate thereof) to ship liquid chemicals on
parcel tankers traveling to and from the United States and
elsewhere at any time during the period from June 1, 1998 to and
including February 20, 2003.

30.    Plaintiff believes that there are hundreds of Class members as above described,

the exact number and their identities being known by defendants.

31.    The Class is so numerous and geographically dispersed that joinder of all

members is impracticable.

32.    There are questions of law and fact common to the Class, which questions relate

to the existence of the conspiracy alleged, and the type and common pattern of injury sustained

as a result thereof, including but not limited to:

    (a)    Whether defendants and their co-conspirators engaged in a combination
and conspiracy among themselves to fix, raise, maintain or stabilize
freight rates on parcel tankers traveling to and from the United States and
elsewhere;

    (b)    The identity of the participants in the conspiracy;

    (c)    The duration of the conspiracy alleged in this Complaint and the nature
and character of the acts performed by defendants and their co-
conspirators in furtherance of the conspiracy;

    (d)    Whether the alleged conspiracy violated Section 1 of the Sherman Act;

    (e)    Whether the conduct of defendants and their co-conspirators, as alleged in
this Complaint, caused injury to the business and property of plaintiff and
other members of the class;

9

(f)     The effect of defendants' conspiracy on the freight rates for parcel tankers traveling to and from the United States and elsewhere during the relevant period; and

(g)     The appropriate measure of damages sustained by plaintiff and other members of the class.

33.     Plaintiff is a member of the Class, plaintiff's claims are typical of the claims of the members of the Class, and plaintiff will fairly and adequately protect the interests of the members of the Class.  Plaintiff is a direct purchaser of parcel tanker freight and its interests are coincident with and not antagonistic to those of the other members of the Class.  In addition, plaintiff is represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

34.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for defendants.

35.     Defendants have acted, and refused to act, on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class as a whole.

36.     The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

37.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  The Class is readily definable and is one for which records should exist in the files of defendants and their co-conspirators.  Prosecution as a class action

will eliminate the possibility of repetitious litigation.  Treatment as a class action will permit a

large number of similarly situated persons to adjudicate their common claims in a single forum

simultaneously, efficiently and without duplication of effort and expense that numerous

individual actions would engender.  Class treatment will also permit the adjudication of

relatively small claims by many class members who otherwise could not afford to litigate an

antitrust claim such as is asserted in this Complaint.  This class action presents no difficulties of

management that would preclude its maintenance as a class action.

## THE PARCEL TANKER SHIPPING MARKET

38.     The defendants control about 65% of the worldwide parcel tanker shipping

market.  Defendants Stolt and Odfjell each book close to a quarter of the roughly $2.5 billion

spent each year shipping liquid chemicals by sea. They transport them in giant ships called

parcel tankers, each fitted with as many as 52 separate tanks. Jo Tankers -- which was founded

by different members of the same Norwegian family that dominates Odfjell – has another 9% of

the market. Tokyo Marine has about 6%.

39.     On February 20, 2003, The Wall Street Journal ran a story on page one suggesting

that Stolt, Odfjell and others may have colluded on parcel tanker freight rates.  The article stated,

in relevant part, that:

> In summer 1998, Stolt managers from around the world gathered
> near the Connecticut offices of the company's shipping unit. It was
> a rough time for the parcel- tanker business. The Asian financial
> crisis had depressed chemical volumes, and with a glut of new
> ships making matters worse, freight rates were suffering.
>
> But as the executives sat overlooking the golf course on a back
> patio of the Greenwich Country Club, Andrew Pickering, then vice
> president for tanker trading, had calming news. According to

people familiar with the meeting, he said that Odfjell and Stolt had reached an agreement that certain customers belonged to Stolt and others to Odfjell. They had "carved up the world," he said, according to one attendee.

### # # #

On May 24, 2000, Richard B. Wingfield, a New Zealander who was managing director of Stolt's Asia Pacific service, e-mailed colleagues in Greenwich. The subject: talks with the No. 4 parcel-tanker company, Tokyo Marine. The e-mail said he had spoken to Satoshi Kuwano, its chief executive. "Kuwano realises," wrote Mr. Wingfield, using British spelling, "that the only way to move the market is through cooperation."

In another e-mail the same day, Mr. Wingfield cited a talk with another Tokyo Marine executive who, he said, was interested in finding a way for the shippers to work together after the merged BP-Amoco entered an Asian market. Mr. Wingfield wrote: "He wants cooperation on rates. The problem is to get everyone to cooperate."

### # # #

Journal entries dated in March 2001 indicate that Stolt and Odfjell scheduled a meeting for March 30 at the South Shore Harbour Resort in League City, Texas. Entries indicate that Odfjell was to be represented by three men: Mr. Nilsen, a vice president named Morten Nystad, and their boss, Mr. Haugsdal. Representing Stolt would be Mr. Wingfield and his lieutenant, Bjorn Jansen, senior vice president for Pacific service.

Journal entries suggest Stolt and Odfjell executives spent much of the afternoon reviewing the status of contracts around the world, trade lane by trade lane. A notation indicates Odfjell wanted to bid for its old Union Carbide contracts to ship chemicals to Asia from the Gulf of Mexico. One entry then says: "both talk to Dow & compare notes."

### # # #

After the meeting, Stolt executives attempted to quantify the costs and benefits of cooperating instead of competing, according to tables and spreadsheets that were part of a fax to Mr. Wingfield from Mr. Jansen dated April 10, 2001. It suggests that "the coop" -- a term used at Stolt to describe its relationship with Odfjell – kept

freight rates on key accounts 5% to 25% higher than they would
otherwise have been.

The spreadsheets included estimates of the impact of the coop on
specific contracts. For Stolt contracts involving Dow's Pacific
business alone, the coop with Odfjell meant that freight rates might
be as much as 25% higher than otherwise -- equal to $10 million a
year -- the Stolt spreadsheets indicated.
In the fax, Stolt's Mr. Jansen compared the economic costs of
"going to war" with Odfjell versus continuing the coop. He wrote
that in certain trade lanes, such as the Indian Ocean, Stolt might
benefit if the coop was disbanded. But he said that overall, the loss
of the coop would mean lower freight rates.

What's more, Mr. Jansen continued, disbanding the coop at that
time would be a "particularly poor" choice. Odfjell, he wrote, was
"not desperate to coop to `survive.' If we break the coop now, it is
likely to take a long time to put it back together. . . . If you add it
all up, it is difficult to see the sense of going to `war.' "

# # #

The journals are replete with notations such as "no written
agreements" or "no paper." A May 2001 entry refers to knowledge
Stolt had obtained about plans that Jo Tankers had about a Dow
contract, followed by the words: "Don't be seen as doing
something together." Jo Tankers didn't respond to questions.

# # #

A report to Stolt executives from Tokyo Marine's Mr. Kuwano
heightened concerns that Dow might replace Stolt on some trade
lanes. Entries in the journal indicate that Mr. Kuwano, after
meeting with Dow officials, related that they were "angry" and had
a "strong feeling" that Stolt and Odfjell were "power playing" Dow
in the Gulf. Dow won't comment on what Mr. Kuwano might have
said to Stolt, but confirms that it expressed unhappiness with
efforts by Stolt and Odfjell to do a legal joint bid.

40.     On or about February 20, 2003, defendant Stolt issued a press release announcing

the existence of antitrust investigations by the European Commission and U.S. Department of

Justice.  According to Stolt's press release, the investigations are "to ascertain whether there is

evidence of a cartel agreement and related illegal practices for deep-sea maritime tanker

services."

      41.    On or about February 25, 2003, defendant Stolt issued a press release announcing

that it had received conditional amnesty in connection with the parcel tanker antitrust

investigations.  The press release stated, in relevant part:

> The Stolt-Nielsen Transportation Group (SNTG), a wholly-owned
> subsidiary of Stolt-Nielsen S.A. (Nasdaq: SNSA; Oslo Stock
> Exchange: SNI), today reported that it is cooperating with
> competition authorities in the European Union in connection with
> an investigation into possible collusive behavior in the intra-
> European inland barge industry. As noted in press releases last
> week, SNTG had previously reported that it is cooperating with
> competition authorities in the United States and the European
> Union in connection with investigations into possible collusive
> behavior in the parcel tanker industry.
>
> SNTG has been granted conditional amnesty from prosecution and
> fines for violation of U.S. antitrust laws by the Antitrust Division
> of the U.S. Department of Justice under its Corporate Leniency
> Program with respect to parcel tanker operations. SNTG also has
> been granted conditional immunity from imposition of fines by the
> European Commission with respect to deep-sea parcel tanker and
> intra-European inland barge operations.
>
> During the course of an internal investigation undertaken by
> SNTG, the Company became aware of possible collusive behavior
> and notified the appropriate authorities. As a result, SNTG, its
> relevant affiliates and directors and employees, have been granted
> conditional amnesty from prosecution and fines, subject to the
> conditions of the amnesty programs, including continued
> cooperation.

      42.    On or about June 24, 2003, in connection with the parcel tanker criminal antitrust

investigation, Richard B. Wingfield, the former Managing Director of the Tanker Trading

Division of defendant Stolt-Nielsen Transportation Group, Ltd. was arrested and charged with

violating Section 1 of the Sherman Act (15 U.S.C. §1) in the U.S. District Court for the Eastern

District of Pennsylvania, Criminal Case No. 2:03-mj-576-UJ-ALL.  The arrest warrant stated

that Mr. Wingfield and others conspired "to suppress and eliminate competition by allocating

customers, fixing prices and rigging bids for parcel tanker shipping of products to and from the

United States and elsewhere, in unreasonable restraint of interstate and foreign trade and

commerce, in violation of Section 1 of the Sherman Act."  Mr. Wingfield has been released on

bail of $500,000.

      43.    On September 29, 2003, the Department of Justice issued a press release

announcing that  Odfjell Seachem and two of its officers were charged with, and plead guilty to

allocating markets and fixing prices for the shipment of specialty liquids:

> Norwegian-based Odfjell Seachem AS, one of the largest parcel
> tanker shippers in the world, and two of its executives were
> charged today with participating in an international cartel to
> allocate customers, rig bids and fix prices on parcel tanker
> affreightment contracts for the shipment of specialty liquids to and
> from the United States and elsewhere, the Department of Justice
> announced.
>
> The company, Odfjell Seachem AS and its executives, Bjorn
> Sjaastad, Chief Executive Officer of its parent, Odfjell ASA, and
> Erik Nilsen, Vice President, were charged separately today in U.S.
> District Court in Philadelphia. The company and both executives,
> who are citizens of Norway, have agreed to plead guilty and
> cooperate with the ongoing investigation.  Additionally, Odfjell
> Seachem, with its principal place of business in Bergen, Norway,
> has agreed to pay a $42.5 million fine for its role in the cartel.
> Sjaastad has agreed to pay a $250,000 fine and to serve four
> months in prison and Nilsen has agreed to pay a fine of $25,000
> and to serve three months in prison for their roles in the cartel. The
> charges, fines and jail time are subject to court approval.

44.     On December 8, 2003, the Department of Justice issued a press release

announcing that a former executive of Defendant Jo Tankers agreed to plead guilty to price

fixing charges:

> Hendrikus van Westenbrugge, a former co-Managing Director of
> JO Tankers B.V., based in Spijkenisse, the Netherlands, was
> charged in Philadelphia today with participating in an international
> cartel to allocate customers, rig bids and fix prices on parcel tanker
> affreightment contracts for shipments of specialty liquids to and
> from the United States and elsewhere, the Justice Department
> announced.
>
> Van Westenbrugge has agreed to plead guilty and cooperate with
> the ongoing investigation. In addition, van Westenbrugge, a Dutch
> citizen, has agreed to serve three months incarceration and pay a
> fine of $75,000. The plea agreement and recommended sentence
> are subject to court approval.

45.     On December 9, 2003, the Wall Street Journal reported that according to people

familiar with the chemical shipping price fixing investigation, the conditional amnesty

granted to Stolt-Nielsen Transportation was under review because of "new information in

the case."

## VIOLATIONS ALLEGED

46.     Beginning at least as early as June 1, 1998, and continuing until at least February

20, 2003, the exact dates being unknown to plaintiff, defendants and their co-conspirators

engaged in a continuing agreement, understanding and conspiracy in restraint of trade to

artificially fix, raise, maintain or stabilize freight rates on parcel tankers traveling to and from the

United States and elsewhere in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

16

47.     The contract, combination and conspiracy consisted of a continuing agreement, understanding and concert of action among the defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain or stabilize freight rates on parcel tankers traveling to and from the United States and elsewhere.

48.     In formulating and effectuating the aforesaid contract, combination or conspiracy, defendants and their co-conspirators did those things that they combined and conspired to do, including, among other things:

(a)     discussing which shipping business each would bid for, route by route, and  exchanging information on bid prices;

(b)     agreeing to charge prices at certain levels and otherwise to fix, raise, maintain or stabilize freight rates on parcel tankers traveling to and from the United States and elsewhere; and

(c)     shipping cargo on parcel tankers traveling to and from the United States and elsewhere at the agreed upon prices.

49.     The activities described above have been engaged in by defendants and their co-conspirators for the purpose of effectuating the unlawful arrangements to fix, raise, maintain or stabilize freight rates on parcel tankers traveling to and from the United States and elsewhere.

## **FRAUDULENT CONCEALMENT**

50.     Throughout the relevant period, defendants and their co-conspirators affirmatively

and fraudulently concealed their unlawful conduct against plaintiff and the Class.

17

51.     Plaintiff and the members of the Class did not discover, and could not have discovered through the exercise of reasonable diligence, that defendants and their co-conspirators were violating the antitrust laws as alleged herein until shortly before this litigation was commenced. Nor could plaintiff and the members of the class have discovered the violations earlier than that time because defendants and their co-conspirators conducted their conspiracy in secret, concealed the nature of their unlawful conduct and acts in furtherance thereof, attempted to confine information concerning the combination and conspiracy to high-level officials and fraudulently concealed their activities through various other means and methods designed to avoid detection.

52.     Only on or about February 20, 2003, when an article in The Wall Street Journal suggested that certain parcel tanker companies may have colluded on rates, was the existence of the conspiracy disclosed to the public.  Plaintiff and the members of the class could not have discovered the unlawful conduct at an earlier date through the exercise of reasonable diligence because of defendants' and their co-conspirators' active and purposeful concealment of their unlawful activities.

53.     Defendants and their co-conspirators engaged in a successful, illegal price-fixing conspiracy with respect to parcel tanker freight, which they affirmatively concealed, in at least the following respects:

>          (a)     By meeting secretly to discuss freight rates for parcel tankers traveling to and from the U.S. and elsewhere;

(b)     By agreeing among themselves at meetings and in communications not to
discuss publicly, or otherwise reveal, the nature and substance of the acts
and communications in furtherance of their illegal scheme; and

(c)     By giving false and pretextual reasons for the parcel tanker freight rates
during the relevant period and by describing such pricing falsely as being
the result of competitive factors rather than collusion.

54.     As a result of defendants's and their co-conspirators' fraudulent concealment of
their conspiracy, plaintiff and the class assert the tolling of any applicable statute of limitations
affecting the rights of action of plaintiff and the members of the class.

## INJURY TO PLAINTIFF AND THE CLASS

55.     During and throughout the period of the conspiracy alleged in this Complaint,
plaintiff and members of the Class paid freight to defendants, their co-conspirators, or their
subsidiaries or controlled affiliates to ship liquid chemicals on parcel tankers.

56.     The unlawful contract, combination or conspiracy has had the following effects,
among others:

(a)     Freight charged by defendants and their co-conspirators to plaintiff and
the members of the Class for shipping liquid chemicals on parcel tankers
was maintained at artificially high and non-competitive levels; and

(b)     Plaintiff and members of the Class had to pay more for shipping liquid
chemicals on parcel tankers than they would have paid in a competitive
marketplace, unfettered by defendants' and their co-conspirators'
collusive and unlawful price-fixing.

19

57.     Plaintiff and the other members of the Class paid more for shipping liquid chemicals on parcel tankers than they would have paid under conditions of free and open competition.

58.     As a direct and proximate result of the illegal combination, contract or conspiracy, Plaintiff and the members of the Class have been injured and financially damaged in their respective businesses and property, in amounts which are presently undetermined.

### **PRAYER FOR RELIEF**

WHEREFORE, plaintiff prays  that:

A.     The Court determine that this action may be maintained as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure ("FRCP") and directing that reasonable notice be provided in compliance with FRCP 23(c)(2);

B.     The Court adjudge and decree that the contract, combination and conspiracy alleged herein is a *per se* unreasonable restraint of trade in violation of Section 1 of the Sherman Act;

C.     Judgment be entered against defendants, jointly and severally, and in favor of plaintiff and the class it represents for damages as allowed by law as determined to have been sustained by them, together with costs of suit, including reasonable attorneys' fees;

D.     Defendants, co-conspirators, successors, assigns, parents, subsidiaries, affiliates and transferees, and their respective officers, directors, agents and employees, and all other persons acting or claiming to act on behalf of defendants or in concert with them, be permanently enjoined and restrained from, in any manner, directly or indirectly, continuing, maintaining or

renewing the combinations, conspiracy, agreement, understanding or concert of action, or

adopting any practice, plan, program or design having a similar purpose or effect in restraining

competition;

        E.      The Court award plaintiff and the class it represents attorneys' fees and costs, and

pre-judgment and post-judgment interest as permitted by law; and

        F.      The Court award plaintiff and the class it represents such other and further relief

as may be necessary and appropriate.

## JURY TRIAL DEMAND

      Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury of all of the claims

asserted in this Complaint so triable.

Dated: February _____, 2004                  Respectfully submitted,

                                            **SACK, SPECTOR & KARSTEN, LLP**

                                        By:_____

                                            Scott M. Karsten

                                            836 Farmington Avenue

                                            West Hartford, CT  06119

                                            (860) 233-8251

                                            *Plaintiff's Liaison Counsel*

                                            **BOLOGNESE & ASSOCIATES, LLC**

                                            Anthony J. Bolognese

                                            Joshua H. Grabar

                                            One Penn Center

                                            1617 JFK Blvd., Suite 650

Philadelphia, PA  19103

**KAPLAN FOX & KILSHEIMER, LLP**
Robert N. Kaplan
805 Third Avenue, 22nd Floor
New York, NY 10022
(212) 687-1980

**FOX ROTHSCHILD O'BRIEN**
     **& FRANKEL LLP**
Steven A. Asher
2000 Market Street, 10th Fl.
Philadelphia, PA 19103
(215) 299-2000

**HOFFMAN & EDELSON, LLC**
Marc H. Edelson
45 West Court Street
Doylestown, PA 18901
(215) 230-8043

**TRUJILLO RODRIGUEZ**
   **& RICHARDS, LLC**
Ira Neil Richards
226 West Rittenhouse Square
Philadelphia, PA 19103
(215) 731-9004

22